**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

KHALISHA R BOZEMAN                                                    PLAINTIFF


v.                          **Case No. 4:18-cv-00904-LPR**


ARKANSAS FOUNDATION                                              DEFENDANT
FOR MEDICAL CARE


## ORDER

The Arkansas Foundation for Medical Care ("AFMC") is a non-profit organization that provides services to health care providers and their beneficiaries.[1]  Among other things, AFMC operates a Call Service Center ("Service Center") that helps Arkansas consumers troubleshoot issues related to Medicaid benefits.[2]  AFMC employed Khalisha Bozeman as a Case Analyst from April of 2016 until October of 2018.[3]  Ms. Bozeman's Case Analyst position was part of the Service Center division.[4]  Her work duties primarily involved, but were not entirely limited to, correcting and properly linking incorrect beneficiary records in the Medicaid Management Information System.[5]

Ms. Bozeman alleges that over the course of her employment AFMC unlawfully discriminated and retaliated against her in violation of Title VII, 42 U.S.C. § 1981, and the Arkansas Civil Rights Act ("ACRA").[6]  Specifically, Ms. Bozeman alleges the existence of a race-

---

[1]  Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 1.

[2]  *Id.* ¶ 3.

[3]  *Id.* ¶¶ 10, 39.

[4]  *Id.* ¶ 10.

[5]  *Id.*; Ex. 11 to Def.'s Mot. for Summ. J. (Doc. 30-11).

[6]  Pl.'s Second Am. Compl. (Doc. 12) ¶ 1.

based hostile work environment, several race-based failures to promote, and retaliation for filing claims with the Equal Employment Opportunity Commission ("EEOC").[7]  AFMC filed a Motion for Summary Judgment on all three claims.[8]

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.[9]  Conversely, if the nonmoving party can present specific facts by "affidavit, deposition, or otherwise, showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[10]  It is important to understand that "[t]he mere existence of a factual dispute is insufficient alone to bar summary judgment."[11] To prevent summary judgment, the dispute of fact must be both genuine and material.[12]  A genuine dispute of fact exists where a rational jury could decide the particular question of fact for either party.[13]  A material dispute of fact exists where the jury's decision on the particular question of fact determines the outcome of an issue under the substantive law.[14]

The moving party has the burden of showing the Court (i.e., pointing out) that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the

---

[7]  Ms. Bozeman's Second Amended Complaint (Doc. 12) implicitly asserts that each of these claims are actionable under Title VII, § 1981, and the ACRA.  Ms. Bozeman's Second Amended Complaint (Doc. 12) and her Brief in Opposition to Summary Judgment (Doc. 42) make clear that she believes the outcome of her three claims under a Title VII analysis is dispositive of the outcome of those same claims under § 1981 and ACRA.  The Court agrees.

[8]  Def.'s Mot. for Summ. J. (Doc. 30).

[9]  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (citing FED. R. CIV. P. 56).

[10]  *Grey v. City of Oak Grove, Mo.*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[11]  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989) (citation omitted).

[12]  *Id.*

[13]  *Id.*

[14]  *Id.* When deciding a motion for summary judgment, the Court must "base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial." *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted).  Parties may not rely on inadmissible hearsay to avoid summary judgment; nor may they rely on statements that otherwise violate the Rules of Evidence, such as statements made without personal knowledge.  *Id.*

nonmoving party on that essential element of the nonmoving party's case.[15]  If the moving party meets that burden, the burden then shifts to the nonmoving party to show that there is a genuine dispute of material fact.[16]  The nonmoving party meets this burden by designating specific facts in affidavits, depositions, answers to interrogatories, admissions, or other record evidence that shows "there is a genuine issue for trial."[17]  The Court must view the evidence in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences.[18] Accordingly, for purposes of the summary judgment motion here, the Court considers the most pro-plaintiff version of the record that a reasonable jury could rationally conclude occurred.

## I.    Hostile Work Environment.

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."[19]  To establish a claim for hostile work environment based on race a plaintiff must show that: "(1) he or she is a member of a protected group; (2) he or she is subjected to unwelcome race-based harassment; (3) the harassment was because of membership in the protected group; and (4) the harassment affected a term, condition, or privilege of his or her employment."[20]  The workplace environment must be "permeated with discriminatory intimidation, ridicule, and insult' that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

---

[15]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[16]  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Torgerson*, 643 F.3d at 1042.

[17]  *Celotex Corp.*, 477 U.S. at 322-24.

[18]  *Pedersen v. Bio-Med. Applications of Min*n., 775 F.3d 1049, 1053 (8th Cir. 2015).

[19]  42 U.S.C. § 2000e-2(a)(1).

[20]  *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005).

environment." [21]  It "must be both objectively hostile as perceived by a reasonable person and subjectively abusive as actually viewed by [the plaintiff]."[22]

When considering the objective component, courts must examine the totality of the circumstances, "including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance and whether the conduct unreasonably interfered with the employee's work performance."[23]  Courts must also consider the "physical proximity to the harasser, and the presence or absence of other people" in the totality of the circumstances.[24]  Claims of hostile work environment must meet a demanding standard and courts are tasked with "filtering out" complaints that only raise "ordinary tribulations of the workplace."[25]  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."[26] And "when a plaintiff attempts to establish a hostile work environment based on the actions of co-workers, he or she must then present evidence that the employer knew or should have known about the harassment and failed to respond in a prompt and effective manner."[27]

It is fair to say that the mountain for plaintiffs to scale on a hostile work environment claim—both at the summary judgment stage and at trial—is high and steep.  Consider, for example, the facts in *Singletary v. Missouri Department of Corrections*.[28]  Craig Singletary, an African

---

[21]  *Id.* (quoting *Tademe v. Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003)).

[22]  *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518-19 (8th Cir. 2010).

[23]  *Id.*

[24]  *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999).

[25]  *Anderson*, 606 F.3d at 519 (quoting *Al–Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005)).

[26]  *Arraleh v. County of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006).

[27]  *Anderson*, 606 F.3d at 519 (internal quotation omitted).

[28]  423 F.3d 886.

American man, brought a claim of racially hostile work environment against his employer.  He reported several instances of his colleagues using the most offensive racist epithet—the n-word, being called "a little shiny face," having his car damaged while parked at work (punctured tires, scratches, damaged antenna), and enduring a staff member posting a "a picture of Aunt Jemima . . . during Black History Month."[29]  After Mr. Singletary transferred to a different workplace, his boss allegedly stated, "that nappy headed little [n-word] won't be bothering us anymore.  I got rid of him."[30]  The Eighth Circuit affirmed the district court's grant of summary judgment in favor of the employer, finding that these instances did not amount to a hostile work environment based on race because they were not sufficiently severe and pervasive.[31]

This case is not an outlier.  The Eighth Circuit also affirmed the district court's grant of summary judgment on a hostile work environment claim in *Bainbridge v. Loffredo Gardens, Inc.*, where the employers peppered their conversations with derogatory comments such as "Jap," "nip," "gook," "spic," "wetback," "monkey," and the n-word.[32]  And, in *Jackson v. Flint Ink*, the Eighth Circuit made clear that six highly offensive instances of managers and coworkers using the n-word and burning-cross graffiti did not constitute a hostile work environment.[33]  While appropriately

---

[29]  *Id.* at 888-90.

[30]  *Id.* at 890.

[31]  *Id.* at 892-94.

[32]  378 F.3d 756, 759 (8th Cir. 2004); *see also Abdel-Ghani v. Target Corp.,* 686 F. App'x 377, 378 (8th Cir. 2017) (unpublished decision) (affirming summary judgment in favor of the employer when the plaintiff's coworkers referred to him as a "camel jockey," "terrorist," "sand [n-word]," said that people like him "should be rounded up in one place and nuked," and was told "go back home, go to [his] country.").

[33]  370 F.3d 791, 793 (8th Cir. 2004).  The Eighth Circuit panel granted rehearing on the hostile work environment claim after discovering a fact in the record (which neither party had previously pointed out) that showed a serious physical threat to the plaintiff.  *Jackson v. Flint Ink N. Am. Corp.*, 382 F.3d 869, 869-70 (8th Cir. 2004).  Even with this newly found fact, the Court considered the summary judgment question as "not altogether free from doubt" and noted that the case was still only on the "cusp of submissibility."  *Id.*  But ultimately, the Court found that the serious physical threat tipped the scale so that the case survived summary judgment and went to a jury. The panel did not walk away from the analysis in its initial decision.  That analysis is still essentially the law as applied to the set of facts described by the initial decision.  Indeed, the Eighth Circuit in *Bainbridge v. Loffredo Gardens, Inc.,* gave positive treatment to the initial reasoning in *Jackson* about not finding an objectively hostile workplace based on the racial slurs and most of the graffiti.  378 F.3d 756, 759-60 (8th Cir. 2004).  Moreover, a

acknowledging that "[r]acial epithets are morally repulsive," the Eighth Circuit explained that its "cases require that a plaintiff show more than an a few occurrences over a course of years."[34] "To be actionable, such conduct must be shown to occur with such frequency that the very conditions of employment are altered and be viewed by a reasonable person as hostile."[35] My role as a district court judge is not to question whether the Eighth Circuit's decisions were correct. My role is to faithfully apply the standard set by the Eighth Circuit.

Ms. Bozeman, who is African American, worked for AFMC from April of 2016 until October of 2018.[36] During the course of Ms. Bozeman's employment, various employees at the Service Center made inappropriate and offensive statements that either were race-based or were perceived to be race-based. Many of the statements were made by Tonisa Bourn. Ms. Bourn is Caucasian.[37] At the time she made the statements, Ms. Bourn was a mid-level supervisor at the Service Center, although she was not Ms. Bozeman's supervisor or the supervisor for team on which Ms. Bozeman worked.[38]

- Ms. Bourn said, "If y'all don't get on the phone, y'all going to make me crack my whip."[39] She said this to a group of workers that included African American employees.[40] Ms. Bozeman did not hear this comment.[41] It was repeated to Ms.

---

year after the *Jackson* rehearing decision, the Eighth Circuit in *Singletary* employed the reasoning from the initial *Jackson* decision to say that Eighth Circuit caselaw does not deem a workplace as hostile from the use of six racial epithets by coworkers and managers over the course of a year and half. 423 F.3d 886, 893 (8th Cir. 2005).

[34] *Singletary*, 423 F.3d at 893.

[35] *Id.*

[36] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶¶ 10, 39.

[37] Ex. 10 to Def.'s Mot. for Summ. J. (Doc. 30-10) at 26:4-7.

[38] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 48; Ex. 19 to Def.'s Mot. for Summ. J. (Doc. 30-19); Ex. 11 to Pl.'s Opp'n to Def.'s Mot for Summ. J. (Doc. 40-11) at 39:17-40:4

[39] Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 52:1-4.

[40] Ex. 6 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-6) at 26:12-22.

[41] Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 52:4.

Bozeman by a co-worker, who may have been one of the original targets of the comment.[42]  Ms. Bozeman believed this comment evoked slavery and racism.[43]

- Ms. Bourn also said that she was "going to gather up her strays."[44]  Ms. Bozeman did not hear this comment.[45]  It was repeated to Ms. Bozeman by a co-worker, who may have been one of the original targets of the comment.[46]

- Ms. Bourn said, "[w]elcome to south of the border," in reference to a row of bilingual Spanish-speaking service representatives.[47]   At the summary judgment hearing, AFMC's attorney said that Ms. Bozeman heard this comment first-hand.[48]  The record, however, is far less clear.  For purposes of summary judgment the Court will assume that Ms. Bozeman heard the comment firsthand.  (This is being overly generous to Ms. Bozeman in terms of the record.)  Ms. Bozeman has not alleged that she is Hispanic or Latina.[49]

- Ms. Bourn said to a worker, "[w]hat [are] you doing on my side of the fence."[50]  Ms. Bozeman did not hear this comment.  It was repeated to her by a co-worker, who may have been the original target of the comment.[51]  Ms. Bozeman has not alleged that she is Hispanic or Latina.

Ms. Bourn was not the only offender.  In response to the question "where were all the black men at," Charlotte Hicks (a mid-level supervisor, who had at an earlier time supervised Ms. Bozeman)[52] said that the company had "met [its] quota for having black males."[53]  Ms. Bozeman

---

[42]  *Id.*

[43]  *Id.* at 52:9-16.

[44]  *Id.* at 194:13-15.

[45]  *Id.*

[46]  *Id.*

[47]  Ex. 14 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-4) at 37:25-38:20.

[48]  Tr. at 22.

[49]  It appears from the record that Kristin McGehee (who is African American, not Hispanic or Latina) heard this statement firsthand.  Ex. 4 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-4) at 41:2-10.  Meanwhile, Ms. Bozeman indicates she did not hear any of Ms. Bourn's offensive comments firsthand, with the exception of the printer issue described on page nine of this Order.  Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 11:17-12:8 (responding "I didn't hear any" to counsel's question of "did you hear any of those alleged comments from Tonisa?").

[50]  Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 11:17-12:8.

[51]  *Id.*

[52]  *Id.* at 39:17-21.

[53]  *Id.* at 107:5-14.

did not hear this comment.[54]  It was repeated to her by the co-worker that had this interaction with Ms. Hicks.[55]  Derrick Edwards, a Caucasian employee, told a Latino Medicaid beneficiary over the phone that he would "put them in the back of his truck and take them to the border [him]self."[56] Mr. Edwards was fired for this statement after Ms. Bourn reported it to Human Resources.[57]  Ms. Bozeman did not hear the offensive statement made by Mr. Edwards.[58]  However, Matthew Martin, the Service Center's Assistant Manager, later followed up on Mr. Edwards' comment by laughing and noting to Ms. Bozeman that Mr. Martin was "going to make this call center great again."[59]

It appears the foregoing statements and interactions (approximately seven of them) occurred prior to March of 2017.  Ms. Bozeman reported and discussed all of these statements with Amy Bryant, the Service Center Manager, in March of 2017.[60]  At the same time, Ms. Bozeman raised a concern that Ms. Hicks seemed to go out of her way to look at whatever work Ms. Bozeman and Ms. Bozeman's current supervisor (Ms. McGehee, also an African American woman) were doing on a given day.[61] This behavior made Ms. Bozeman feel uncomfortable.[62] Ms. Bozeman asked Amy Bryant to have Ms. Hicks stop this conduct.[63]  Ms. Bryant informed Ms. Bozeman that Ms. McGehee also reported similar conduct by Ms. Hicks to Ms. Bryant.[64]  Ms. Bryant also told Ms. Bozeman that Ms. Hicks used to do the same thing to Ms. Bryant: go into

---

[54]  *Id.*

[55]  *Id.*

[56]  Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 45.

[57]  *Id.* ¶ 46.

[58]  Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 53:15-57:24.

[59]  *Id.* at 62:21-63:20

[60]  Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 15.

[61]  Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 43:15-44:18.

[62]  *Id.* at 50:11-12.

[63]  *Id.* at 42:16-23.

[64]  *Id.*

Ms. Bryant's office, look at her screen, and observe what she was doing.[65]   Ms. Bryant is Caucasian.  In Ms. Bozeman's conversation with Ms. Bryant, Ms. Bryant dubbed Ms. Hicks "a redneck," but said that she did not believe Ms. Hicks "was a racist because she was from Sheridan."[66]  Ms. Bozeman also reported Ms. Hicks' conduct to a Human Resources leader, Mindy Dunn.[67]  Ms. Dunn told Ms. Bozeman that "we all do the same thing" and "it really doesn't matter. We all do the same work."[68]   Ms. Bozeman felt that Ms. Dunn dismissed her complaint when Ms. Dunn said "Oh, it's all right, you know, if she just stares."[69]

Ms. Dunn, testified that "AFMC investigated the matters" with regard to conduct by Ms. Bourn, Mr. Martin, and Ms. Hicks, but did not find Ms. Bozeman's "allegations to be substantiated."[70]  Ms. Dunn stated that "Human Resources did counsel Bourn and Hicks" but did not provide further detail what steps AFMC took to resolve the issue with Ms. Hicks' conduct.[71]

Several months later, in July of 2017, there was another incident.  Sherron Langel, an African American woman, approached Ms. Bourn about being locked out of her computer.[72] Either Ms. Langel forgot the password, or the password was not working.  Ms. Bourn poked Ms. Langel in the head with her finger and stated, "why don't you use your little bitty brain."[73]  Ms. Bozeman did not witness the encounter between Ms. Langel.  Ms. Langel told Ms. Bozeman about

---

[65]   *Id.* at 44:4-45-4.

[66]   *Id.* at 51:16-18.

[67]   Ms. Bozeman's meeting with Ms. Bryant took place on March 31, 2017.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 15.  Ms. Bozeman's meeting with Ms. Dunn took place on May 17, 2017.  Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 16.

[68]   Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 50:6-13.

[69]   *Id.* at 50:17.

[70]   Ex. 4 to Def.'s Mot. for Summ. J. (Doc. 30-4) ¶ 11.

[71]   *Id.* ¶ 12.

[72]   Ex. 6 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-6) at 32:19-33:7.

[73]   Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 10:23-11:3; Ex. 6 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-6) at 33:1-24.

the incident the same day that it happened.[74]  After this incident, the Human Resources team issued a writeup to Ms. Bourn.[75]  Amy Bryant described the category of violation given as "kind of a building category where if you get in trouble for something minor . . . you are spoken to . . . you sign the document and you understand what you've been instructed to do . . . ."[76]  Ms. Bourn was not suspended and kept her job.[77]  Ms. Bourn did not receive the $1500 bonus she was otherwise expecting that year.[78]  Later in 2019 (after Ms. Bozeman left the company), Gloria Boone, then the Director of the Service Center and an African American woman, increased Ms. Bourn's work duties to include training employees.  This bumped Ms. Bourn's pay up by $2,000.[79]

Ms. Bozeman had her own negative interactions with Ms. Bourn.  On an unidentified date, Ms. Bozeman asked Ms. Bourn for help with the printer.[80]  Instead of helping Ms. Bozeman, Ms. Bourn instructed Ms. Bozeman to look at the picture on the printer.[81]  Ms. Bozeman explained this made her feel insulted and humiliated, as though she was "incompetent of knowing that the printer already had an error."[82]  Ms. Bozeman noted that Ms. Bourn had a different reaction when a Caucasian co-worker asked for help with the printer.[83]  Ms. Bozeman felt that Ms. Bourn refused

---

[74]  Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 10:20-21.

[75]  Ex. 6 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-6) at 35:1-9.  AFMC has three categories of performance issues, with category three being the least severe and category one being the most severe.  Ex. 1 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-1) at 29:18-30:10.  While the record is somewhat unclear what category level Ms. Bourn's writeup was, the Court views the facts in the light most favorable to Ms. Bozeman and construes the writeup as a level three, the least severe category.

[76]  Ex. 1 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-1) at 29:22-30:2.

[77]  Ex. 6 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-6) at 36:12-24.

[78]  *Id.*

[79]  *Id.* at 58:12-25.

[80]  Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 12:2-8.

[81]  *Id.*

[82]  *Id.*

[83]  *Id.* at 13:7-14:14.

to help minorities.[84]  When a minority would ask for help, Ms. Bozeman observed Ms. Bourn to act negative, angry, unprofessional, and unwelcoming.[85]  In contrast, Ms. Bozeman observed that Ms. Bourn was friendly towards Caucasian employees and had a different tone and approach.[86]

Ms. Bozeman also testified that on multiple occasions in 2017 and 2018 Ms. Bourn followed Ms. Bozeman to the breakroom and bathroom.  Ms. Bourn is physically taller and larger than Ms. Bozeman by a fair amount.[87]  On one occasion, as Ms. Bozeman exited the bathroom, she noticed Ms. Bourn standing right behind the bathroom door.[88]  On a different occasion,  when Ms. Bozeman exited her bathroom stall, she was startled to find Ms. Bourn facing her and with her back to the sink.[89]  On an unspecified date, Ms. Bourn and Ms. Bozeman were both in the breakroom when Ms. Bozeman observed Ms. Bourn pretend to speak to someone on her cellphone while watching Ms. Bozeman.[90]  Ms. Bozeman perceived all of this behavior to be  retaliation for Ms. Bozeman informing Human Resources and the EEOC about Ms. Bourn's offensive statements.[91]  To be as generous to Ms. Bozeman as possible, the Court will also include this conduct in its hostile workplace analysis.

Ms. Bozeman testified that, on June 12, 2018, she felt physically threatened by Ms. Bourn.[92]  When Ms. Bozeman returned from the bathroom to her desk, she passed by Ms. Bourn

---

[84]  *Id.* at 13:5-6.

[85]  *Id.* at 13:22-24.

[86]  *Id.* at 13:7-14:14.

[87]  *Id.* at 75:3-7.

[88]  *Id.* at 77:9-12.

[89]  *Id.* at 77:13-19.

[90]  *Id.* at 78:1-10.

[91]  Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 43; Pl.'s Second Am. Compl. (Doc. 12) ¶ 11.

[92]  Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 87:18-22.

who was seated eating a block of cheese using a knife to cut slices of cheese.[93]  As Ms. Bozeman

walked by, Ms. Bourn said to Ms. Bozeman, "I better put this up, huh?"  Ms. Bozeman told Ms.

Bourn that she should put away the cheese and knife.[94]  Ms. Bozeman felt physically threatened

by this interaction and returned to her desk very upset.[95]  Ms. Bozeman reported this incident, and

Ms. Bourn's previous behavior of following Ms. Bozeman to the bathroom, to Human Resources

the same day.[96]  Ms. Bozeman filed a police report the following day.[97]  The event was record by

a security camera.[98]  The AFMC Human Resources department and the police reviewed the tape

and determined that Ms. Bozeman's claims of Ms. Bourn physically threatening her were

unsubstantiated by the video.[99]  The Court has reviewed the video, which shows no threatening

movement whatsoever.  Indeed, it shows no significant interaction at all, aside from Ms. Bozeman

walking by Ms. Bourn's desk.  Of course, Ms. Bourn still could have made the statement ascribed

to her by Ms. Bozeman.

On June 13, 2018, the day after the alleged knife incident, Ms. Bozeman left work at 10:30

a.m. because she felt unsafe and unable to work at AFMC.[100]  Ms. Bozeman's doctor placed her

on medical leave and AFMC provided Ms. Bozeman all available time for leave.[101]  On October

---

[93]  *Id.* at 86:10-87:3.

[94]  *Id.*

[95]  *Id.* at 87:1-25.

[96]  *Id.* at 87:18-88:12.

[97]  *Id.* at 91:17-19; Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 31.

[98]  Ex. 15 to Def.'s Mot. for Summ. J. (Doc. 30-15).

[99]  Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶¶ 33-36.

[100]  *Id.* ¶ 37.

[101]  *Id.* ¶ 37-39.

3, 2018, AFMC notified Ms. Bozeman that it was unable to keep providing her with unpaid leave at that point and sent her a letter of termination.[102]

The Court does not like or condone what was said and done by the AFMC employees in this case.  And if the Court was sitting in the place of AFMC's Human Resources manager, it would have made different decisions in investigating and punishing the misbehavior.  But, given the precedent in this Circuit, no rational jury could find that AFMC's conduct rises to the level of severity and pervasiveness that would be actionable under Title VII.  Title VII "is not a general civility code for the American workplace."[103]  To rise to a Title VII violation, the Eighth Circuit requires conduct that is substantially more severe and pervasive than the conduct exhibited by AFMC.

The record reveals about ten offensive race-based statements and interactions over the course of two years.  Most of the statements and interactions were not heard or witnessed first-hand by Ms. Bozeman.  Ms. Bozeman was not the direct target of most the statements and interactions.  These were not racially charged statements made to Ms. Bozeman or about her specifically.  That doesn't excuse the statements or interactions, but it does undermine their status as evidence of discrimination against Ms. Bozeman that is severe and pervasive enough to alter the conditions of her employment and create an abusive working environment for her.

Further undermining the evidentiary utility of several (but not all) of these proffered statements is the fact that Ms. Bozeman is not Hispanic or Latina.  Many of the statements identified were derogatory to and targeted at Hispanics and Latinos specifically.  For example, consider Ms. Bourn's "south of the border" and "side of the fence" comments.  Or consider Mr.

---

[102] *Id.* ¶ 39; Ex. 13 to Def.'s Mot. for Summ. J. (Doc. 30-13).

[103] *Hervey v. County of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008) (quoting *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005)).

Edwards' comments about taking certain people back to the border himself. These are ugly and offensive comments. But they are not about people of Ms. Bozeman's race. Title VII prohibits discrimination "against any *individual* . . . because of such *individual's* race . . . ."[104] As a general matter, Title VII's textual emphasis on the individual employee suggests that derogatory statements about a race of which the employee is not a member are of no, or extremely limited, evidentiary value in the hostile work environment analysis. This is the inescapable implication, if not the exact holding, of the Eighth Circuit's decision in *Tovar v. Essentia Health*.[105] Perhaps there is a yet-to-be-seen hypothetical and extreme situation where derogatory statements against a race other than the plaintiff's race have such a close nexus to the plaintiff or the plaintiff's race that the statements can be considered significant in the overall toxic mix. But the case at bar does not present such a situation.

With respect to Ms. Hicks sometimes looking to see what Ms. Bozeman and Ms. McGehee were working on, nothing suggests this was race-based or race-motivated. Indeed, Ms. Bozeman worked under Ms. Hicks when Ms. Bozeman first joined the company and Ms. Bozeman reported having no problems with Ms. Hicks then.[106] Moreover, nothing suggests Ms. Hicks watched Ms. Bozeman throughout the day or on a regular basis. Indeed, for a large part of the time period at issue Ms. Hicks worked in a separate building.[107] Maybe Ms. Hicks was nosy. Whatever the issue, it doesn't provide evidence of a severe and pervasively discriminatory workplace.

---

[104] 42 U.S.C. § 2000e-2.

[105] 857 F.3d 771, 775-76 (8th Cir. 2017); *see also Kelley v. Iowa State Univ. of Sci. & Tech.*, 311 F. Supp. 3d 1051, 1068 (S.D. Iowa 2018) (reasoning that the plaintiff could not maintain a discrimination claim suffered by other students and employees).

[106] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶¶ 11-12.

[107] Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 47:21-49:15.

With respect to the several times that Ms. Bourn followed Ms. Bozeman to the breakroom or bathroom and the printer incident between Ms. Bozeman and Ms. Bourn, those incidents simply do not rise to the level of severity of pervasiveness necessary under Eighth Circuit caselaw. This is true even when these incidents are taken together with everything else in the record. Even if one could assume these incidents were race-based or race-motivated, the record at most proves these incidents to be isolated and, as an objective matter, not threatening or humiliating.

And then there is the cheese knife incident. On its own or in conjunction with the other record evidence, it does not get Ms. Bozeman over the summary judgment hurdle. Company security footage depicts Ms. Bourn sitting down in a chair the entire time and holding a plate of cheese on her lap.[108] She made no sudden movements and was surrounded by co-workers who passed by her casually throughout the entire time she ate the cheese. The surveillance video footage did not show her making any remarkable movements for the near hour she sat there with the cheese block. That includes when Ms. Bozeman walked by. A reasonable person would not find this conduct threatening. Nor would a reasonable person take what was said by Ms. Bourn— "I better put this up, huh?"—as threatening. This is a far cry from the facts in *Bowen v. Missouri Department of Social Services*, where the Eighth Circuit reversed summary judgment on a hostile work environment claim when an African-American woman charged at her Caucasian co-worker's cubicle saying, "I'm going to take you outside and we will settle this once and for all."[109]

Here's the bottom line. Ten statements and interactions over the course of Ms. Bozeman's employment, most of which were not witnessed nor heard directly by Ms. Bozeman, do not create a workplace permeated with "discriminatory intimidation, ridicule, and insult."[110] Without a

---

[108] Ex. 15 to Def.'s Mot. for Summ. J. (Doc. 30-15).

[109] 311 F.3d 878, 882 (8th Cir. 2002).

[110] *Anderson*, 606 F.3d at 518 (8th Cir. 2010) (internal quotation omitted).

doubt, Ms. Bozeman subjectively viewed these events as abusive.  But that's not enough to get past summary judgment.  The law requires an objectively reasonable person to perceive the work environment as hostile based on the totality of the circumstances.  The record, even viewed in the light most favorable to Ms. Bozeman, fails to meet that standard.  No rational jury could conclude otherwise.  Accordingly, the Court GRANTS summary judgment in favor of AFMC on the claim of hostile work environment based on race.

## II.   Failure to Promote.

Failing to give a promotion to an employee based on race is unlawful discrimination.[111]  A plaintiff can establish a discriminatory failure to promote either by direct evidence or by creating an inference of unlawful discrimination.[112]  Evidence is direct when it shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action.[113]  If a plaintiff cannot present direct evidence, then courts analyze a plaintiff's claims under the *McDonnell Douglas* burden-shifting framework.[114]

Under that framework, "[t]o raise a presumption of discrimination in failure-to-promote cases, a plaintiff must show that (1) she is a member of a protected group; (2) she was qualified and applied for a promotion to an available position; (3) she was rejected; and (4) similarly situated employees, not part of the protected group, were promoted instead."[115]  "If a plaintiff establishes

---

[111] Failure to promote can also "constitute an adverse employment action that would support a plaintiff's retaliation claim."  *AuBuchon v. Geithner*, 743 F.3d 638, 643 (8th Cir. 2014).

[112] *Bone v. G4S Youth Services, LLC*, 686 F.3d 948, 953 (8th Cir. 2012).

[113] *Torgerso*n, 643 F.3d at 1043-44 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004))

[114] *Pedersen*, 775 F.3d at 1054.

[115] *Shannon v. Ford Motor Co*., 72 F.3d 678, 682 (8th Cir. 1996).  Ms. Bozeman agrees that this is the appropriate iteration of the prima facie test.  *See* Pl.'s Br. in Supp. of Resp. in Opp'n to Mot. for Summ. J. (Doc. 42) at 13.

her prima facie case, the burden of production shifts to the employer, who must rebut the presumption of discrimination with evidence 'that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'"[116]  Then, if the employer is able to rebut the presumption of discrimination, the plaintiff may prevail by showing evidence that exposes the employer's reasoning "as a mere pretext for intentional discrimination."[117]  It is important to remember that the plaintiff must provide evidence not just of pretext, but of pretext for intentional discrimination.

Ms. Bozeman alleges that AFMC passed her over for a promotion on three occasions because of her race.  The first occasion was in early October of 2016, when Ms. Bozeman had been on the job as a Case Analyst for approximately six months.[118]  At this time, at least two of Ms. Bozeman's co-workers were promoted to supervisory roles.  Kristen McGehee, an African American woman, was promoted to a supervisor role where she led a team comprised of Case Analysts and Research Specialists.[119]  This was the team on which Ms. Bozeman worked as a Case Analyst.[120]  Tonisa Bourn, a Caucasian woman, was promoted to lead the Service Representative Team.[121]  Prior to her promotion, Ms. Bourn had been a member of the Service Representative Team.[122]  Ms. Bozeman had never been on the Service Representative Team and had never been in a Service Representative role during her time at AFMC.

---

[116] *Id.* (quoting *Texas Dep't of Cnty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).

[117] *Id.* (citing *Krenik v. Cty of Le Sueur*, 47 F.3d 953, 958 (8th Cir. 1995)).

[118] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 19; Pl.'s Second Am. Compl. (Doc. 12) ¶ 7.

[119] Ex. 4 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-4) at 8:3-9:25; Ex. 19 to Def.'s Mot. for Summ. J. (Doc. 30-19).

[120] Ex. 4 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-4) at 10:11-21; Ex. 19 to Def.'s Mot. for Summ. J. (Doc. 30-19).

[121] Ex. 6 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-6) at 10:22-17:11.

[122] *Id.* at 13-14.

The differences between a Case Analyst and a Service Representative are explained in the deposition of the Service Center General Manager Amy Bryant. "A Service Center Representative will speak to the beneficiary over the phone, handle any types of issues that [they] can immediately see in the system, provide [clients] with that information. Or if it's something that needs to be escalated, go through the escalation process . . . ."[123] On the other hand, a "case analyst handles more research-type work, links the Medicaid numbers, looks into billing issues, claims issues. Anything that's more complicated that [a Service Center Representative] can't answer on a phone call."[124] Case analysts "have time to go through and look up the information; whereas a representative on the phone has to be quick and go through the systems and know which system to go to, and they have to go through multiple systems while they're on that call."[125] The Service Center Representatives have to meet call and time quotas.[126]

Although Ms. Bozeman had not been in the Service Representative role at AFMC, she says that she was qualified for the supervisory role over that team.[127] Ms. Bozeman notes that she had prior experience working with Medicaid issues.[128] Before AFMC, Ms. Bozeman worked at Hewlett Packard where her responsibilities included processing Medicaid claims, answering calls from providers, and maintaining knowledge of Medicaid recipient categories.[129] Ms. Bozeman also describes how during her employment at AFMC she stood out from Ms. Bourn because Ms.

---

[123] Ex. 1 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-1) at 60:14-19.

[124] *Id.* at 60:8-11.

[125] *Id.* at 60:24-61:4.

[126] *Id.* at 61:4.

[127] Pl.'s Second Am. Compl. (Doc. 12) ¶ 7; Ex. 11 to Def.'s Mot. for Summ. J. (Doc. 30-11) at 29.

[128] Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 112:22-42.

[129] Ex. 1 to Def.'s Mot. for Summ. J. (Doc. 30-1) at 297.

Bozeman worked side by side with her supervisor on multiple projects.[130]  On one particular occasion, Ms. Hicks asked for Ms. Bozeman's help to create a research manual, which Ms. Bozeman believes demonstrates her knowledge of Service Center policies and procedures.[131]  Ms. Bozeman also describes how she went beyond her job duties to help and train new employees.[132] She testified that she would coach them and check in to make sure their "day-to-day functions were being met" because if someone did not perform well then their whole team would be affected.[133]  Ms. Bozeman believed this coaching and training went beyond her job duties and made her stand apart for a promotion over Ms. Bourn.

Ms. Bozeman believes that she was not selected for the supervisory role over the Service Representative Team because she is African American.  Ms. Bozeman provides no direct evidence to support this allegation.  And the propriety of using the *McDonell Douglas* test is questionable here.  That is because these were not "competitive" vacancies in the sense that an open spot was announced, applications collected, screenings and interviews conducted, and a person ultimately selected from among the pool of applicants.  Rather, the supervisory roles were what AFMC called "direct promotions."[134]  As best as the Court can tell, what this term meant at AFMC was that (1) a need to fill a vacated or newly created role was identified, (2) management determined whether there was someone on staff it believed had the right mix of skills for that role, and (3) management asked that person to take on the new role. There was no job posting or application process.[135]

---

[130] Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 113:2-11.

[131] *Id.*

[132] *Id.* at 59:14-60:1.

[133] *Id.*

[134] Ex. 3 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-3) at 22:8-9.

[135] *Id.* at 22:6-24:1; Ex. 1 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-1) at 55:16-59:25.  There is no suggestion that AFMC employed this promotion method as a way to insulate discrimination.  The record discusses four direct promotions: the two just discussed (Tonisa Bourn, a Caucasian woman, and Kristin McGehee, an African American woman), as well as Matthew Martin (a Caucasian man) and Sessily Williams (an African

A prima facie case for failure to promote usually requires the employee to have applied for the promotion.  In her deposition. Ms. Bozeman testified that "back in 2016 right before [Ms. Bourn] and [Ms. McGehee] [were] promoted," the Service Center Manager Amy Bryant "promised that when she had the chance that she was going to promote [Ms. Bozeman] to be a team lead."[136]  Specifically, Ms. Bryant "promised [Ms. Bozeman] that [Ms. Bryant] was going to create a claims supervisor position and that [Ms. Bozeman] was going to be promoted and that [Ms. Bryant] was picking out a team for [Ms. Bozeman]."[137]  This is not hard evidence that Ms. Bozeman ever asked for a promotion prior to October 2016.  But a rational juror could reasonably infer that by this time Ms. Bozeman had expressed an interest to Ms. Bryant in promotion to some supervisory role.  After all, why else would Ms. Bryant promise Ms. Bozeman a promotion in the future?  In light of the foregoing, and for summary judgment purposes only, the Court concludes that the "applied for" and "rejected from" portions of the prima facie case have been met.  The Court also concludes, for summary judgment purposes only, that Ms. Bozeman was at least minimally qualified for the supervisory role over the Service Representative Team.

That leaves prong four of the *McDonnell Douglas* prima facie test: were Ms. Bourn and Ms. Bozeman similarly situated?  "While '[t]he burden of establishing a prima facie case of disparate treatment is not onerous,' the plaintiff must be able to produce some evidence of similarity between her and her comparator."[138]  Courts look at things like job titles, pay rates, and the nature of the work performed by each employee to determine if there is any evidence of similarity.  Consider, for example, the Eighth Circuit decision in *Rebouche v. Deere & Co*.:

---

American woman).  AFMC no longer uses direct promotions. All vacancies are competitive now. Ex. 8 to Def.'s Mot. for Summ. J. (Doc. 30-8) at 30:4-31:21.

[136] Ex. 11 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 61:3-12.

[137] *Id.* at 61:4-7.

[138] *Rebouche v. Deere & Co*., 786 F.3d 1083, 1087 (8th Cir. 2015) (citing *Torgerson*, 643 F.3d at 1047).

[T]he only male employee that Rebouche says was similarly situated to her is Wilson. Before the GJE process, Wilson was a senior engineer at Grade 8 and Rebouche was a chemical/metallurgical engineer at Grade 7. After GJE, Wilson was promoted to Staff Engineer Product at Grade 9 while Rebouche remained at Grade 7. Rebouche claims that she and Wilson were similarly situated because they had the "same type of responsibilities" before GJE. But Rebouche does not explain further just what those responsibilities were or provide any evidence of the tasks they allegedly each performed. Nor does Rebouche present any evidence regarding Wilson's work history, education, or other qualifications to compare to her own. Without any additional distinguishing evidence, we are left with only their job titles and pay grades in determining if Rebouche and Wilson were similarly situated.

While "[t]he burden of establishing a prima facie case of disparate treatment is not onerous," *Torgerson v. City of Rochester*, 643 F.3d 1031, 1047 (8th Cir. 2011) (en banc), the plaintiff must be able to produce some evidence of similarity between her and her comparator. Rebouche has failed to produce any such evidence and has therefore failed to show that Wilson, who had a different job title and pay grade, was similarly situated to her. In addition, several men who were similarly situated to Rebouche, in that they were at Grade 7 before GJE, remained at Grade 7 after GJE like Rebouche. We therefore agree with the district court that Rebouche has failed to establish a prima facie case of sex discrimination.[139]

At the time of the promotion, Ms. Bourn had been with the company for 15-18 months.[140] Ms. Bozeman had been with the company for 6 months. Ms. Bourn had been a member of the team, and had performed the role, that she was being promoted to supervise. Ms. Bozeman had not. On this record, and in the context of this case, the Court does not think Ms. Bozeman and Ms. Bourn are similarly situated. Instead, if Ms. Bozeman is similarly situated to anyone who got a promotion it would be to Ms. McGehee. Ms. McGehee was promoted to lead the Case Analyst team—the team on which Ms. Bozeman worked. But Ms. Bozeman can't make out a prima facie case for that position because Ms. McGehee is also an African American woman.

---

[139] *Id.* at 1087-88.

[140] Ex. 6 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-6) at 10:16-21.

Ms. Bozeman disputes that the differences in the length of time she and Ms. Bourn each worked at the company renders them dissimilar.[141]  Ms. Bozeman points to the AFMC Employee Handbook, which in a section on promotions and transfers provides that:

> When a vacancy occurs, the applying employee having the greatest ability, skill, training and other relevant qualifications to fill the opening may be selected before the position is advertised externally.  This determination is made by the hiring manager and human resources.  If two applying employees score equally on the criteria, the selection is based on seniority.  In all other respects, promotions are treated the same as any other hire/rehire.[142]

This handbook is from June of 2019, and it notes that there was a revision in April of 2019.[143]  Ms. Bozeman wasn't even with the company in 2019.  Ms. Bozeman has not provided the version of the handbook that was operative in 2016.  The Court cannot conclude this language was present in that older version.  This is especially true given that it appears that, by 2019, the concept of "direct promotions" had been entirely replaced by competitive selection.[144]  The quotation above from the 2019 handbook is clearly focused on competitive vacancies and so it stands to reason that language (or portions of it) may have been different back in 2016.  In any event, the quoted language does not mandate that length of time with the company is always irrelevant except as a tie-breaker.  It simply says length of time with the company will be the tie-breaker if a tie-breaker is needed.  Ms. Bozeman also notes that Amy Bryant, the Service Center Manager, testified at her deposition that seniority was not the deciding factor in the direct promotion of Ms. Bourn.[145]  But that doesn't mean it wasn't a significant factor in the analysis.

---

[141] Tr. at 59-60.

[142] Ex. 14 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-14) at 2-3.

[143] Ex. 14 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-14).

[144] Ex. 8 to Def.'s Mot. for Summ. J. (Doc. 30-8) at 30:4-31:21.

[145] Tr. at 59.  The Court takes the reference to "Amy Dunn" by counsel for Ms. Bozeman to be an accidental misstatement intended to mean "Amy Bryant" given Ms. Bryant's deposition. Ex. 1 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-1) at 95:4-96:11.

Ms. Bozeman also disputes that a sufficient dissimilarity arises from the fact that Ms. Bozeman was a Case Analyst while Mr. Bourn was a Service Center Representative.[146]  But this seems to be a pretty significant dissimilarity—especially in the context of this case where one person (Ms. Bourn) was promoted out of the Service Center Representative Team to be that team's supervisor, while one person (Ms. McGehee) was promoted out of the Case Analyst Team to be that team's supervisor.[147]  Although Ms. Bozeman provides more discussion about the nature of her work compared to the nature of Ms. Bourn's work prior to the promotion than was provided to the Court in *Rebouche*,[148] none of that information could lead a rational jury to conclude Ms. Bozeman was similarly situated to Ms. Bourn for purposes of this promotion.

The Court concludes that Ms. Bozeman does not have enough evidence to get past the prima facie stage.  But even if the Court is wrong about that, summary judgment is still appropriate here.  AFMC has provided a legitimate, nondiscriminatory reason for promoting Ms. Bourn to the supervisory role over the Service Center Representative Team.  AFMC thought Ms. Bourn was "best for that position."[149]  Ms. Bryant testified that she and her boss at the time (Tereasa Holmes) discussed the needs of the business and who would be best to fill the open roles.  Specifically, Ms. Bryant explained:

> We had the discussion about needs, the business needs.  And Ms. Holmes said, "These are the ones I think should fill these roles."  And she had different reasons why: performance, leadership skills, certain things that she had seen in them.  And so we went and talked to HR and said, "These are the decisions we want to make." And it went into effect.  That's how it happened.[150]

---

[146] Tr. at 65-67.

[147] Ex. 6 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-6) at 9:14-11:18; Ex. 4 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-4) at 9:1-16; Ex. 19 to Def.'s Mot. for Summ. J. (Doc. 30-19).

[148] 786 F.3d at 1087-88.

[149] Ex. 1 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-1) at 62:13-18.

[150] *Id.* at 63:16-23.

Tereasa Holmes had been Ms. Bourn's direct supervisor in the past, so Ms. Holmes had plenty of occasions to evaluate Ms. Bourn.[151]  And as discussed above, Ms. Bourn had actually performed the Service Center Representative Role and had been a part of the Service Center Representative Team for a good amount of time prior to being promoted to its supervisor.

Ms. Bozeman responds that she was more qualified than Ms. Bourn.  But, very wisely, Congress has not authorized this Court to act as some sort of super-personnel board, reviewing each hiring and promotion decision to ensure private companies really do pick the most qualified person for every job.  Even if the evidence could show that Ms. Holmes and Ms. Bryant made the wrong call as to who was the "best" or most qualified for this position, just being wrong doesn't equate to pretext in this situation.  No rational juror could find that Ms. Bozeman's qualifications were so much better than Ms. Bourn's as to suggest that AFMC's legitimate, nondiscriminatory reason was pretextual.[152]  Employers are entitled to weigh different skills, strengths, and weaknesses of various employees.  There is no evidence from which a rational juror could conclude that the employer's proffered reason is "unworthy of credence . . . because it has no basis in fact."[153]  There is also no evidence from which a rational juror could conclude "that a prohibited reason more likely motivated the employer."[154]

---

[151] Ex. 6 to Pl'n's Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-6) at 10:6-13.

[152] *See Torgerson*, 643 F.3d at 1049 (inventorying cases where pretext may be inferred); *see also Wingate v. Gage County Sch. Dist.*, 528 F.3d 1074, 1080 (8th Cir. 2008) ("Where, as here, an employer contends that the selected candidate was more qualified . . . than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision.  If the comparison reveals that the plaintiff was only similarly qualified or not as qualified as the selected candidate, then no inference of age discrimination would arise.  Conversely, if the comparison successfully challenges the employer's articulated reason for the employment decision, it might serve to support a reasonable inference of discrimination.") (internal citations and internal quotations omitted).

[153] *Torgerson*, 643 F.3d at 1047 (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)).

[154] *Id.*

Even if there was some way to squint at the record evidence to suggest AFMC's proffered legitimate, nondiscriminatory reason was pretext, there is no record evidence whatsoever that it was pretext *for discrimination*.  There is simply no evidence whatsoever that race played any part in the decision made by Ms. Holmes and Ms. Bryant.  Indeed, the undisputed record evidence shows that Ms. Bryant was attempting to carve out a different supervisory role for Ms. Bozeman at or around this time.[155]  But that role never came to fruition because of budgetary constraints and business needs.[156]  Moreover, as discussed above, one of the two direct promotions made at this time was an African American woman and two of the four direct promotions that the Court knows about were African American women.  Finally, there is nothing in the record to suggest any of Ms. Bourn's offensive statements were made prior to this promotion.  For all the foregoing reasons, the Court GRANTS summary judgment to AFMC regarding the alleged failure to promote in 2016.

The second potential failure to promote was in January or February of 2017.  Ms. Bozeman applied for an Outreach Specialist position.[157]  Nine other AFMC workers applied as well.[158]  Before any interviews were scheduled, the position was eliminated after AFMC determined that the position was no longer needed.[159]  No one ever filled this position.[160]  Although AFMC's counsel brought this fleeting promotional opportunity up at the summary judgment hearing,[161] it

---

[155] Ex. 1 to Pl's Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-1) at 63:24-64:14 (Ms. Bryant testifying that she recommended Ms. Bozeman "a couple of times for other roles" such as "a billing or team lead-type position to assist with billing and claims issues for Medicaid" but was told that was not yet possible given the budget); Ex. 24 to Def.'s Mot. for Summ. J. (Doc. 30-24) (emails between Amy Bryant and Michael Dumas showing that Ms. Bryant inquired about creating a Claims Analyst Team Lead job); Ex. 11 to Pl's Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-11) at 61:2-62:19.

[156] Ex. 1 to Pl's Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-1) at 64:5-12.

[157] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 21.

[158] *Id.*

[159] *Id.*; Ex. 22 to Def.'s Mot. for Summ. J. (Doc. 30-22).

[160] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 21.

[161] Tr. at 16.

appears that Ms. Bozeman is not relying on this occasion for her failure to promote (or retaliation) claim. The incident is not discussed in the Second Amended Complaint. And it is not discussed in Ms. Bozeman's summary judgment briefing. Of course, there's good reason for that. Ms. Bozeman could not possibly make out a prima facie case under *McDonnell Douglas* because the position was eliminated and thus no one received that promotion. And there's no direct evidence of discrimination either. To the extent that it is even necessary to say or do, the Court GRANTS summary judgment to AFMC regarding the alleged failure to promote in 2017.

The third potential failure to promote was in March or April of 2018. Ms. Bozeman applied for a supervisor position in March and interviewed in April.[162] Ms. Bozeman alleges that AFMC selected Devon Carver, a Caucasian woman, for the position even though Carver was less qualified than Ms. Bozeman. A large part of the dispute here is whether there were one or two positions that that were available and whether Ms. Bozeman applied for one of the positions or both of the positions. It's useful to understand what each side believes occurred.

AFMC says that, at the time Ms. Bozeman applied, there were two open supervisor positions: a Grievance Supervisor and a Reporting Supervisor.[163] AFMC says that each position had different responsibilities. The Reporting Supervisor "had a primary function of creating technical report rating, dashboards, and other processes related to Salesforce, as well as [the] phone systems."[164] The Grievance Supervisor was primarily intended "to supervise Customer Service representatives that did not require technical skillset(s)."[165] AFMC says that Bozeman applied and interviewed specifically for the Grievance position. AFMC hired Devon Carver for the Reporting

---

[162] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 24.

[163] *Id.* ¶ 25.

[164] Ex. 6 to Def.'s Mot. for Summ. J. (Doc. 30-6) ¶ 3.

[165] *Id.*

Supervisor position.[166]   Then, before any applicant was selected for the Grievance Supervisor position, budget cuts took place causing the Grievance Supervisor position and several other open positions to be cancelled.[167]   The Grievance Supervisor position was never revived and filled.  If this story is correct—or more specifically if this is the only story that a rational jury could conclude is correct based on the record—then Ms. Bozeman cannot make out a prima facie case because the position she applied for was never filled by anyone.  Even if she could make out a prima facie case, AFMC provided a legitimate, nondiscriminatory reason for eliminating the position—budget cuts.  And there's no record evidence that reason is pretext for discrimination.

AFMC has some strong evidence to support their story.  Specifically, after Ms. Bozeman saw that Ms. Carver received a promotion, she emailed Mallory Hopper in Human Resources.[168] Ms. Bozeman asked, "[i]s this a different position or the one for the Grievance Supervisor Position that I interview[ed] for?"[169]   Ms. Hopper responded to Ms. Bozeman that "[t]he Grievance Supervisor that you interviewed for is still open and a candidate has not been selected yet," and that Ms. Bozeman would be notified when a decision was made.[170]   Ms. Bozeman responded, "Great! Thank you."  This email chain indicates that Ms. Bozeman understood there were two distinct supervisory roles and that she had applied specifically for the Grievance Supervisor role.[171] Ms. Bozeman does not suggest she applied for the role given to Ms. Carver and indeed implies the opposite.

---

[166] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 26.

[167] *Id.*

[168] Ex. 23 to Def.'s Mot. for Summ. J. (Doc. 30-23) at 1.

[169] *Id.*

[170] *Id.*

[171] *Id.*

Ms. Bozeman's story is a little harder to decipher.  It has changed somewhat over the course of this litigation.  In the Second Amended Complaint, Ms. Bozeman appears to suggest that there was only one supervisory role open, everyone applied for that role, and that role was given to Ms. Carver.[172]  In Ms. Bozeman's Response to AFMC's Statement of Undisputed Material Fact, Ms. Bozeman denies that "[t]here were two supervisor positions being filled by AFMC at that time, one was for a Grievance Supervisor position and the other was for a Reporting Supervisor."[173] Unfortunately, in that document, Ms. Bozeman does not make plain the basis for her denial, instead cross-referencing various portions of the record without any accompanying explanation.  Exactly what Ms. Bozeman was trying to say with these cross-references was, to be polite about it, difficult to determine.

In Ms. Bozeman's Brief opposing summary judgment, Ms. Bozeman repeatedly says that "Bozeman and Devon Carver applied for the same service center supervisor position."[174]  Ms. Bozeman goes so far as to call the two-separate-vacancies theory "demonstrably false."[175]  The evidence she relies on for the single-supervisor-position theory is that: (1) the same tracking number and name (Supervisor, Service Center) was used for what AFMC alleges were two different positions;[176] (2) a co-worker named Querida Kelley stated in a declaration that each job opening had a different tracking number;[177] and (3) the list of pre-written interview questions for

---

[172]  Pl.'s Second Am. Compl. (Doc. 12) ¶ 12.

[173]  Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 25.

[174]  Pl.'s Br. in Supp. of Resp. in Opp'n to Mot. for Summ. J. (Doc. 42) at 5, 14-15.

[175]  *Id.* at 18.

[176]  *Id.* at 5.

[177]  *Id.* at 8; Ex. 12 to Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Doc. 40-12) ¶ 7.  Ms. Kelley's Declaration did not explain how she had personal knowledge of this fact.  Ms. Kelley did not work in Human Resources.  Ms. Kelley was a Team Lead on a team of Service Center Representatives under Matthew Martin.  Ex. 19 to Def.'s Mot. for Summ. J. (Doc. 30-19).  Federal Rule of Civil Procedure 56(c)(4) states that a "declaration used to support or oppose a motion must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  The Court concludes that Ms. Kelley

both Ms. Carver and Ms. Bozeman were the same.[178]  Despite this fairly consistent argument that there was only a single Service Center supervisor position open, Ms. Bozeman shifted gears at the summary judgment hearing.  Her position became that there were two supervisory Service Center positions open and that she applied for both of them:

> Our position is that there were two supervisory service center supervisor positions open.  Because there's one tracking number, she could apply for both of these positions, and that she did apply.  She interviewed.  She was asked the same questions that Ms. Carver was asked, including experience in reporting.  So it's not as if they were asked different questions.[179]

The Court's read of Ms. Bozeman's shifting argument and the underlying record evidence is that Ms. Bozeman is grasping at straws to try and create a dispute of fact to avoid summary judgment.  Is there a dispute of fact here?  Technically, yes.  Is it a genuine dispute?  No.  Ms. Bozeman was very clear in the email chain with Human Resources that she applied for the Grievance Supervisor position.  Nowhere in the record does she say or suggest that she applied for the Reporting Supervisor position.  The use of one tracking number, a generic tracking name, and the same relatively generic interview questions for both supervisory positions does not mean that Ms. Bozeman can transform her application for the Grievance Supervisor Position into an application for the Reporting Supervisor Position.  No rational jury could conclude Ms. Bozeman

---

does not have the requisite personal knowledge as to whether or not *all* job openings used a different tracking number.  In any event, as discussed below, Ms. Bozeman has shed her old argument—that there was only one open supervisor position—for a new argument that there were two open positions and she applied to both.

[178] Pl.'s Br. in Supp. of Resp. in Opp'n to Mot for Summ. J. (Doc. 42) at 5; Ex. 8 to Pl.'s Opp'n to Def.'s Mot for Summ. J. (Doc. 40-8) at 29.  By and large these questions were generic behavioral questions or questions regarding cross-cutting functions and job duties.  For example: "[w]hy do you think you would be a good fit for this role?" and "[t]ell me about a time things have gone wrong and how you handled that."  These types of questions can be used by most employers and are applicable for most jobs.  Couched amid twenty-one questions is one question asking the candidate what reporting experience he or she has.  Given that this is the sole question out of twenty-one questions to ask about reporting, the Court determines it was not meant as a significant deep dive into the candidates' reporting experience.  Its place among the many generic questions also suggests to the Court that tangential reporting duties were something that AFMC supervisors and employees might typically encounter.

[179] Tr. at 74-75.

applied for the Reporting Position that Ms. Carver got.  Accordingly, as discussed above, Ms. Bozeman cannot make out a prima facie case under *McDonnell Douglas*.  And even Ms. Bozeman concedes there is no direct evidence of discrimination in this alleged failure to promote—her brief solely relies on the *McDonnell Douglas* burden-shifting analysis that is appropriate in the absence of direct evidence of discrimination.[180]  For the foregoing reasons, the Court GRANTS summary judgment in favor of AFMC on this third alleged failure to promote claim.

## III.   **Retaliation**

Everyone agrees that Ms. Bozeman first complained about offensive race-based statements to Service Center Manager Amy Bryant in March of 2017.[181]  Ms. Bozeman filed her first EEOC charge on July 5, 2017, alleging that AFMC denied her and other African Americans promotions because of race, religion, and in retaliation for opposing unlawful practices.[182]  Ms. Bozeman filed a second charge on August 31, 2018, alleging that AFMC retaliated against her for protected activity by subjecting her to harassment and denying her a promotion.[183]  In the instant lawsuit

---

[180] In her Declaration, Ms. Kelley also asserts that she "found out from Matthew Martin that Khalisha Bozeman had scored the highest of any applicant after she had interviewed for a position of supervisor for the Service Center at AFMC, but her supposed inability to be a team player prevented her from receiving the promotion."  Ex. 12 to Pl.'s Opp'n to Def.'s Mot for Summ. J. (Doc. 40-12) at ¶ 6.  This is inadmissible hearsay.  "When an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment."  *Brooks v. Tri-Sys., Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005).  Ms. Kelley repeats an out of court statement by Matthew Martin, and it is offered for the truth of the matter asserted.  It is not the admission of a party opponent because Mr. Martin was speaking outside of his scope of employment.  He was not part of Ms. Bozeman's interview panel, and there is no evidence that he was part of the hiring decision.  In any event, even if the statement was admissible, it is not evidence of discrimination (though it potentially could be evidence of retaliation).  And there is nothing to suggest Mr. Martin was talking about the Reporting Supervisor position as opposed to the Grievance Supervisor Position.

[181] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 15.

[182] *Id.* ¶ 42.

[183] *Id.* ¶ 43. Ms. Bozeman filed a third charge with the EEOC on December 18, 2018 after her employment with AFMC concluded, alleging that she was constructively discharged because of intolerable working conditions.  *Id.* ¶ 44.

before the Court, Ms. Bozeman claims retaliation took the form of failures to promote and harassment that resulted in her constructive discharge.[184]

Title VII "prohibits employer retaliation against employees who engage in a protected activity like filing an EEOC complaint."[185]  When there is no direct evidence of retaliation, a plaintiff must create an inference of retaliation under the *McDonnell Douglas* framework.[186]  The framework has three steps: (1) the plaintiff must establish a prima facie case of retaliation; (2) the burden then shifts to the employer to show a legitimate nondiscriminatory reason for its conduct; and, if the employer produces such evidence, (3) the burden shifts back to the plaintiff to show that the proffered reason was merely pretextual.[187]  For a plaintiff to make a prima facie case of unlawful retaliation, a plaintiff "must demonstrate that (1) [she] engaged in a statutorily protected activity, (2) the employer took adverse employment action against [her], and (3) a causal connection exists between the employee's protected activity and the employer's adverse employment action."[188]

---

[184] Pl.'s Second Am. Compl. (Doc. 12) ¶¶ 11-13.  Ms. Bozeman argues that her protected activity (filing EEOC complaints) led to AFMC creating intolerable working conditions that caused her to take FMLA leave.  When the FMLA leave expired, AFMC terminated Ms. Bozeman's employment because she was still unable to return to work.  Ms. Bozeman alleges this is constructive discharge and her briefing details the conditions that Ms. Bozeman found intolerable and caused her to go on leave.  Pl.'s Br. in Supp. of Resp. in Opp'n to Mot for Summ. J. (Doc. 42) at 20-21.  AFMC's briefing discusses how the facts set forth by Ms. Bozeman fail to establish constructive discharge because her working conditions were not intolerable and AFMC did not intend for her to quit.  Def.'s Br. in Supp. of Mot. for Summ. J. (Doc. 31) at 22-24; Def.'s Reply in Supp. of Mot. for Summ. J. (Doc. 45) at 7-8.  Though the parties both frame the issue as constructive discharge, the Court observes this might not be correct.  Ms. Bozeman did not quit herself but was terminated by AFMC.  If the Court construes her termination as establishing the prima facie case of retaliation, the burden would shift to AFMC to show a nondiscriminatory reason for its conduct.  Here, that nondiscriminatory reason for termination is clear—Ms. Bozeman used her entire FMLA leave of approximately sixteen (16) weeks and still could not return to work.  There is no record evidence to suggest that this is pretext for retaliation.  Even this construction of Ms. Bozeman's claim does not survive summary judgment because there is a clear legitimate nondiscriminatory reason for her termination.

[185] *AuBuchon*, 743 F.3d at 641.

[186] *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 805 (8th Cir. 2019).

[187] *Id.*

[188] *AuBuchon*, 743 F.3d at 641.

In *Burlington Northern & Santa Fe Railway Co. v. White*, the Supreme Court clarified the term "adverse employment action."[189]   An employee claiming adverse employment action must "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."[190]   "An adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities."[191] Failure to promote and constructive discharge certainly qualify as adverse employment actions for purposes of a retaliation claim.

With respect to the alleged failures to promote, Ms. Bozeman only argues that the alleged March or April 2018 failure to promote constituted retaliation for protected activity.   This makes sense.   The two prior alleged failures to promote occurred in September of 2016 and January of 2017, before Ms. Bozeman performed any of the protected activities identified by record evidence. As to the alleged 2018 failure to promote, it is clear that Ms. Bozeman had engaged in statutorily protected activity—EEOC reporting—by March or April of 2018.   So, she passes prong one.

Did she suffer adverse employment action?   For the reasons discussed above in the failure-to-promote section of this opinion, the answer to this question is no.   Because the record allows no rational conclusion except that Ms. Bozeman had applied for the Grievance Supervisor Position, the Grievance Supervisor position was eliminated for budgetary reasons before it was filled, and no one ever got the Grievance Supervisor position, there is no underlying failure to promote that could be considered as the adverse employment action.

---

[189] 548 U.S. 53, 67 (2006).

[190] *Id.*; *see also AuBuchon*, 743 F.3d at 642.

[191] *Tademe*, 328 F.3d at 992 (internal quotations omitted).

The analysis of failure-to-promote-as-retaliation should really end there.  But one might wonder: for purposes of a retaliation claim (as opposed to a discrimination claim), might it be enough to establish adverse employment action that a company eliminates a promotional position to which a person engaged in protected activity has applied?  After all, there is the Declaration of Querida Kelley, who says that she learned from the Assistant Manager of the Service Center Mr. Martin "that Khalisha Bozeman had scored the highest of any applicant after she had interviewed for a position of supervisor for the Service Center at AFMC, but her supposed inability to be a team player prevented her from receiving the promotion."[192]  As discussed in footnote 180 above, this is inadmissible hearsay that the Court is not authorized to consider on summary judgment.  But let's indulge the premise for a moment anyway.  Even if Ms. Bozeman has enough evidence to support a prima facie case, AFMC has provided a legitimate reason for eliminating the planned Grievance Supervisor position—budgetary issues.  And there is no evidence that AFMC has ever revived this position, even after Ms. Bozeman left the company.  Aside from the hearsay in the Declaration of Querida Kelley, there is nothing to suggest that the budgetary issue reason is pretextual, or to raise any inkling or inference of retaliation by way of failure to promote.

Ms. Bozeman also claims that harassment—leading to a hostile work environment and constructive discharge—was done as retaliation for protected activity.[193]  Even if the creation of a hostile work environment counts as an adverse employment action, the Court has already explained in a previous section why no rational jury could find a hostile work environment on the basis of the current record.  And it's even worse for Ms. Bozeman on the retaliation claim, because the Court would not consider any of the statements or interactions made prior to July 5, 2017,

---

[192] Ex. 12 to Pl.'s Opp'n to Def.'s Mot for Summ. J. (Doc. 40-12) ¶ 6.

[193] Pl.'s Second Am. Compl. (Doc. 12) ¶ 11.

which is the first time Ms. Bozeman engaged in statutorily protected activity.[194]  And if there's not a hostile work environment, there's almost certainly not going to be constructive discharge.  The Eighth Circuit determined that a claim of constructive discharge has a higher evidentiary burden than a hostile work environment claim.[195]  "Constructive discharge requires considerably more proof than an unpleasant and unprofessional environment."[196]  "To prove a constructive discharge, an employee must show that the employer deliberately created intolerable working conditions with the intention of forcing her to quit."[197]

Ms. Bozeman identifies the following as the objectively intolerable working conditions: (1) AFMC failed "to give the appropriate disciplinary action to [Ms.] Bourn" after she made "racist statements" and "physically assaulted" a co-worker;[198] (2) Ms. Bourn "intimidated [Ms. Bozeman] with her size and because she followed her around;"[199] (3) Ms. Bozeman "feared for her safety when [Ms.] Bourn pointed the [cheese] knife at her;"[200] and (4) Ms. Bozeman understood from a Human Resources staff member that Mr. Edwards (who made the comment to a client about

---

[194] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 42.

[195] *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 936 (8th Cir. 2002) (quoting *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002)).

[196] *Id.*

[197] *Blake v. MJ Optical, Inc.*, 870 F.3d 820, 826 (8th Cir. 2017) (quoting *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 418 (8th Cir. 2010)).

[198] Pl.'s Br. in Supp. of Resp. in Opp'n to Mot. for Summ. J. (Doc. 42) at 20-21.  This "physical assault" refers to the head-poking incident described above in the hostile work environment section of the Court's Order.

[199] *Id.* at 21.  This "following around" refers to the several occasions when Ms. Bozeman believed Ms. Bourn followed her to the breakroom and bathroom.  This has already been described above in the hostile work environment section of the Court's Opinion.

[200] *Id.*  The "cheese knife" incident has been described above in the hostile work environment section of this Opinion.  The video evidence is very clear that Ms. Bourn did not point a knife at anyone.  Ex. 15 to Def.'s Mot. for Summ. J. (Doc. 30-15).

driving people back to the border) was "terminated . . . only because he made a bigoted comment to an outside party."[201]

Ms. Bourn was punished and reprimanded for her statements and actions.[202]  Ms. Bozeman may believe it was not enough.  This Court may believe it was not enough.  The Court is sure that it was unpleasant for Ms. Bozeman to have to see Ms. Bourn every day.  But, in and of itself, that is not evidence that AFMC intentionally created an intolerable environment for Ms. Bozeman. This is especially true given that Ms. Bourn was not Ms. Bozeman's supervisor.

Ms. Bourn following Ms. Bozeman around the office (on several occasions) to the breakroom and the bathroom is unpleasant, undesirable, and has no place in a professional work environment.  If there was evidence that it occurred consistently for an extended period of time, then there might be enough for Ms. Bozeman to make it past summary judgement.  But the record does not tell us how many times this occurred or how frequently.  The record evidence consists solely of Ms. Bozeman's testimony that twice Ms. Bozeman observed Ms. Bourn in or near the bathroom at the same time as her, Ms. Bourn pretending to talk on her phone in the break room, and generally making Ms. Bozeman feel as if she was under scrutiny.[203]  That's not enough for constructive discharge, even putting aside the fact that there is no evidence whatsoever that Ms. Bozeman was told to do this by AFMC or that AFMC knew of this conduct.

The "cheese knife" incident doesn't get Ms. Bozeman over the summary judgment hump either.  The Court will restate what it said earlier.  Company security footage depicts Ms. Bourn

---

[201] *Id.*  Mr. Edwards made a derogatory comment about Hispanics and was fired for it.  This is described above in the hostile work environment section of this opinion.

[202] Ex. 6 to Pl.'s Opp'n to Def.'s Mot for Summ. J. (Doc. 40-6) at 36:10-24; Ex. 1 to Pl.'s Opp'n to Def.'s Mot for Summ. J. (Doc. 40-1) at 27:11-31:25, 39:6-8.

[203] Ex. 11 to Pl.'s Opp'n to Def.'s Mot for Summ. J. (Doc. 40-11) at 77:9-79:4.

sitting down in a chair the entire time and holding a plate of cheese on her lap.[204]  She made no sudden movements and was surrounded by co-workers who passed by her casually throughout the entire time she ate the cheese.  The surveillance video footage did not show her making any remarkable movements for the near hour she sat there with the cheese block.  That includes when Ms. Bozeman walked by.  A reasonable person would not find this conduct threatening.  Nor would a reasonable person take what was said by Ms. Bourn—"I better put this up, huh?"[205]—as threatening.  It is certainly not the stuff of constructive discharges.  None of these incidents, on their own or in combination, rise to the level of constructive discharge or otherwise constitute adverse employment action that would dissuade protected activity.  No rational jury could conclude otherwise.

For the foregoing reasons, the Court GRANTS summary judgment in favor of AFMC on the retaliation claims.

## IV.    Conclusion

IT IS THEREFORE ORDERED this 29th day of June that AFMC's Motion for Summary Judgment be granted in its entirety and that judgment be entered for AFMC on all claims.


LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[204] Ex. 15 to Def.'s Mot. for Summ. J. (Doc. 30-15).

[205] Pl.'s Resp. to Def.'s Statement of Undisputed Facts (Doc. 41) ¶ 30.